IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAY F. FLANAGAN, JAMES W. CARSON,      )
JOHN M. CHANEY, and DONALD W. JONES,   )
individually and on behalf of all others    )
similarly situated,                        )
                                           )
                    Plaintiffs              )
                                           )
            vs.                             )      No.  01 C 1541
                                           )
ALLSTATE INSURANCE COMPANY, an          )
Illinois corporation, and the AGENT         )
TRANSITION SEVERANCE PLAN,               )
                                           )
                    Defendants.             )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a class of persons previously employed as employee-agents of defendant Allstate, brought suit against Allstate and the Agent Transition Severance Plan ("Allstate") for violations of ERISA and breach of contract. Allstate moves for summary judgment on these class claims. For the following reasons, we grant Allstate's motion.

## BACKGROUND

During the course of its business history Allstate has offered a number of different employment contracts to its agents. Prior to 1984, Allstate sold insurance through employee-agents located in Sears retail stores or local sales offices, known as neighborhood sales offices. These employee-agents generally worked under an employment agreement known as the R830 contract.

Agents with at least twenty years experience, and who were at least fifty years old, could qualify for the General Agent program. These agents still worked under the R830 contract, but were subject to slightly different work requirements. Edward Dixon, senior vice president

of field operations during the period in question, testified that the general agent program was instituted in response to the business needs of older agents, and that general agents were not subject to the same expectations or requirements to produce new customers as were younger agents (plf. exh. B, Dixon dep. at 10, 48-49). Class member Douglas Mark testified that in the later years the stress was on maintaining the size of his book of business, rather than building it (def. exh. 30, Mark dep. at 56).

Beginning in 1984, new Allstate agents were hired under a new employment agreement, the R1500 contract. Around the same time, Allstate introduced a new brand of employee-agents, the neighborhood office agent ("NOA"), in response to other insurance companies' aggressive use of independent contractors. NOAs were governed by the R1500 contract. Existing employee-agents could continue to work under the R830 agreement or convert to the R1500 agreement. However, employee-agents hired after the NOA program's introduction were exclusively employed under the R1500 contract.

Under the program, NOAs were permitted to operate their own small business where they could hire others to work in their offices. They had greater entrepreneurial discretion in the operation of their offices than did neighborhood sales agents or general agents. Under the terms of their agreement NOAs were responsible for all office expenses, but were provided with an office expense allowance to defray certain approved operating costs. This allowance could be used for a number of different expenses, including advertising and hiring licensed support staff (def. exh. 18, Hammack dep. at 192-93). In contrast, general agents were not permitted to hire licensed support staff.

In 1990, Allstate introduced the Exclusive Agency ("EA") program. EAs worked under a new employment agreement, the R3001 contract, and were not employees, but were independent contractors. Unlike the other agent programs, where employee-agents did not

possess a transferable economic interest in any of the insurance business they produced (referred to as a "book of business"), EAs did possess such an interest. They also had more flexibility in their office operations than employee-agents since they were independent contractors. Allstate allowed existing employee-agents to continue working under their respective contracts, but after the introduction of the EA program all newly-hired agents were EAs and worked under the R3001 contract.[1] By January 1999, the EA program had become Allstate's most productive agent program and more than 60% of Allstate's employee-agents had voluntarily converted to EA status. Allstate attributed these changes in part to the flexibility and competitive advantages associated with the EA program.

In the mid-1990s the IRS contended, based on employee-agents' tax filings and treatment of business expenses, that various NOAs were independent contractors rather than employees. This position threatened the tax-qualified status of Allstate's employee benefit plans, as well as the ability of all NOAs to participate in those plans. Allstate engaged in extensive negotiations with the IRS in order to preserve the employee status of the NOA program. The IRS informed Allstate that the concerns could be resolved by converting its employee-agent force to independent contractors. Allstate did not pursue this option. Instead, it decided to continue the NOA program and preserve the tax-qualified status of its employee-agent benefit plans.

In September 1998, after almost two years of negotiations, the IRS and Allstate reached an agreement allowing the NOA program to continue. This agreement, known as the "Closing Agreement on Final Determination Covering Specific Matters" ("closing agreement"), required Allstate to impose additional restrictions on its employee-agents. It mandated that

---

[1] These newly-hired agents entered the EA program after first completing a term under a temporary employment agreement – the R3000 contract.

beginning January 1, 1999, NOAs would perform their services in accordance with specific guidelines that the agreement set forth. These guidelines required Allstate to restructure NOA compensation and expense allowance, and create a new system for office expense reimbursement. It also mandated that no NOA could incur expenses in excess of his or her allowance. Further, the agreement required Allstate to pay a minimum compensation to NOAs, as well as institute new standards for management, evaluation, agent's sales and conduct. Finally, the closing agreement required NOAs to work full-time and maintain set office hours.

To implement the necessary changes to the office expense allowance, Allstate provided NOAs the following options: either receive the same amount they previously received, or increase the amount by one or two percentage points over the base factor, while agreeing to reduce their compensation percent by a corresponding amount. Agents who chose to raise their allowance could not subsequently lower it without company approval. If they went over their allowance, agents had to elect a higher allowance, reduce expenses, or convert to EA status.

By the mid- to late-1990s, facing pressure from competitors and consumers, Allstate began reexamining its brand. Many of Allstate's competitors had moved to 24-hour service, and Allstate understood that to stay competitive it needed to meet and exceed the services provided by its competitors. Allstate's initiative to strengthen its brand was known as the Brand Value Proposition. Allstate engaged in customer research and made a number of discoveries. For example, Allstate discovered that customer call volume was concentrated mostly between the hours of 9 a.m. and 6 p.m.. It further found that a majority of customers expected agents' offices to be open 9 a.m. to 5 p.m. during the week, and also to have Saturday hours. A large minority expected evening hours. Customers also expected to be able to reach a

knowledgeable person at all times, not just "someone who answers the phone" (def. exh. 38, AAS at AF006578). After gathering this data Allstate instituted the Brand Plank Proposition, which was anchored in five basic principles: loyalty, claims service, convenience, simple language and professional advice.

In 1997 and 1998, a vice-president of Allstate, Dwight Hammack, led an initiative named the "Sales Organization of the Future" ("SOOF"). Hammack testified that he worked with about 25 agents, called the agency leadership group, and various vice-presidents around the home office who acted as consultants (def. exh. 18, Hammack dep. at 17-18). At the head of SOOF, Hammack reported to then Chief Operating Officer (later Chief Executive Officer) Ed Liddy (*id.* at 18). Hammack met weekly with a senior management team (which included Ed Liddy, Bob Gary and Mike McCabe) during the early portion of the SOOF initiative.

The SOOF team also worked with a consulting group, McKinsey & Company, who researched other companies, collected data and created numerous documents related to the committee's work. These documents were the culmination of various ideas, estimates and projections for the company.

The parties heartily disagree as to the purpose and outcome of the SOOF initiative. They agree that the SOOF team explored various agency standards, including some service standards. Hammack testified that the SOOF team, using the brand planks, developed service standards, including a requirement that licensed personnel be present at all times in an agent's office, that agents maintain consistent office hours, generally from 9:00 a.m. to 5:00 p.m., and that agents contact customers at least once a year to review policies. Initially, they included a Saturday office hours requirement (Hammack dep. at 51). The parties disagree whether these standards, as developed by SOOF, were ever adopted by Allstate.

Around this same time Allstate developed the Allstate Agency Standards ("AAS"), which

are the subject of this case. The AAS consisted of ten specific standards: two service standards (service availability and customer contact), and eight operating standards (relationship establishment process, Fair Credit Reporting Act, unlicensed support staff, dealership referral program, employee-agent support staff, Allstate remittance processing, agent claim check writing, and marketing/advertising materials). The operating standards were included to ensure compliance with laws, regulations and company policies and procedures. Much of that information was not new to agents. What was new was that they were now "formally documented" and their adherence would be "measured and monitored in the future" (AF 006558). Failure to comply with the AAS subjected an agent to disciplinary action, including discharge. In approximately September 1998, Allstate held meetings introducing its agents to the AAS, and agents were required to sign an acknowledgment of the requirements.

How and why the AAS was developed is the subject of much dispute between the parties,[2] as is whether the SOOF committee's work contributed to its formation.[3] At the same time, plaintiffs concede that Allstate had legitimate business purposes for instituting all but one of these standards.[4] They dispute the business reasons put forth by Allstate regarding the service availability standard.

This standard required agents to be open for business from 9 a.m. to 6 p.m. during the week, and 9 a.m. to 1 p.m. on Saturdays. It also required a licensed professional to be present in the office during all operating hours. Finally, it required agents to forward their phones to

---

[2] It is not disputed that according to the AAS manual the standards were designed to: (1) "make it easier for agents to understand what is expected of them," (2) "provide the guidelines which will ensure that we are able to consistently deliver services to the customer," and (3) "clearly communicate the actions that agents must take to ensure they are in compliance with laws and regulations, and company policies and procedures" (AF 006431).

[3] The parties disagree as to whether the service and customer contact standards under the AAS are similar to or based upon those developed by the SOOF initiative.

[4] See Plf. Response to Def. Stmt. of Material Facts, ¶¶ 62, 63, 66, 67, 70, 72, 75, 79, 81, 83.

a central support center during hours when the agency was closed. The weekday hours' requirement did not become effective until January 1, 1999. The Saturday hours and the requirement that a licensed professional be present did not become effective until July 1, 1999. The phone-forwarding requirement did not have a specific effective date, but was to become effective once Allstate activated the support center for a given agent's market.[5]

The licensed professional requirement meant that a licensed person, either an agent or licensed support staff, had to be in the office during all open hours. During the course of an ordinary day agents were expected to travel to meet with their customers, as well as perform other functions, such as go to lunch, attend training sessions and meetings, and deposit funds at the bank, all while simultaneously operating their offices. General agents were not permitted to hire licensed support staff, and the hiring of such staff came out of an NOA's office expense allowance. Thus, solo general agents, or solo NOAs who did not have licensed support staff, were required to be in the office for all open hours of business, despite these other job requirements. Hammack believed that some agents would have difficulty meeting these standards, which theoretically required the agent or other licensed individual to be in the office at least 45 hours a week, every week of the year. Phil Lawson, vice-president of sales and the alleged creator and implementor of the AAS, also understood that this requirement could be a burden on agents "who weren't properly staffing their offices" (def. exh. 28, Lawson 10/5/07 dep. at 55). However, Hammack testified that, instead, agents could "pair up" – open offices with other agents so that an agent was always present in the office (def. exh. 18, Hammack dep. at 123-24, 194-95). Lawson testified that in other instances agents could "buddy up," meaning that if an agent was going to be out for a day or two they could ask

---

[5]Of the eleven plaintiffs and deposed class members who resigned, no fewer than five gave notice of their resignation prior to January 1, 1999, the effective date of the support staff and weekday hours standards.

another agent in the same geographical area to cover their office (def. exh. 28, Lawson 10/5/07 dep. at 55). Lawson also testified that "small durations of absence," like an agent going to lunch, "probably wasn't something that was monitored heavily, and I doubt seriously if a single agent was ever terminated or pressured because [of it]." (*Id.* at 54).

In November 1999, Allstate announced its decision to eliminate the employee-agent programs in favor of a single EA independent contractor program. This corporate reorganization was known as the Preparing for the Future Group Reorganization Program ("PFFP"). In the fall of 1999, Allstate created the Agent Transition Severance Plan, which provided eligible employee-agents who did not wish to convert to EA status with severance pay for a specific period of time. To be eligible, the employee-agents had to terminate their employment with Allstate (rather than convert), and then elect coverage under the plan. Other incentives were available to employee-agents who chose to convert. The plan was announced and took effect beginning November 1, 1999, and was to last until December 31, 1999. Thus, the plan applied only to employee-agents who remained employed with Allstate as of November 1, 1999. Allstate subsequently revised the plan to include agents who had terminated their employment after June 1, 1999. The period between June 1 and November 1, 1999 was referred to as "the lookback period."

Named plaintiffs Jay Flanagan and James Carson, residents of Illinois, were employed with Allstate from the 1960s until they retired from the general agent program on May 31, 1999 and April 30, 1999, respectively. Named plaintiffs John Chaney and Donald Jones, residents of Florida, were employed with Allstate from the mid-1960s until April 30, 1999 and February 1999, respectively. Chaney was employed under the R830 contract during his tenure, while Jones was under the R1500 contract. In mid-February 1999, Jones converted to EA status, then retired that same year.

## PROCEDURAL BACKGROUND

On March 5, 2001, plaintiffs filed suit on behalf of themselves and a class of former employee-agents, seeking redress for alleged violations of various ERISA provisions, and attorneys' fees and a statutory lien from a prior representation . On November 29, 2001, this court granted, in part, defendant's motion to dismiss, dismissing the claims for attorneys' fees and the statutory lien (finding a lack of jurisdiction and *res judicata*, respectively), but upholding the ERISA claims.

On March 2, 2004, plaintiffs moved for class certification regarding their two ERISA claims, one for a violation of ERISA § 510, the other for a breach of fiduciary duty. On June 21, 2004, the court granted plaintiffs' class certification to the former claim, but not the latter. 223 F.R.D. 489 (N.D. Ill. 2004). The class was certified under Fed. R. Civ. Pro 23(b)(2), since plaintiffs were seeking injunctive relief, rather than damages. However, the court noted that individual determinations would need to be made if the case reached the damages phase, since causation necessarily required an individualized assessment. Allstate moved to reconsider -- which motion was granted in part, allowing plaintiffs to amend the class definition to eliminate concern of a fail-safe class and to limit the class period. 225 F.R.D. 569 (N.D. Ill. 2004).

Allstate appealed, and the Seventh Circuit vacated the class certification, finding that the class should have been certified, if at all, under Rule 23(b)(3), to allow class members notice and a chance to opt out, and also to provide a vehicle for individualized damages determination after a class determination on liability. In re Allstate Ins. Co., 400 F.3d 505 (7th Cir. Ill. 2005). However, just prior to the Seventh Circuit's ruling on the subject, this court came to what amounts to the same conclusion, holding that, based on the revised class definition, the class should be certified under Rule 23(b)(3). 28 F.R.D. 617 (N.D. Ill. 2005).

Also prior to the Seventh Circuit's opinion, plaintiffs were granted leave to file an

amended complaint. They added a count for breach of contract of the R830 agreement. Plaintiffs then sought class certification on this claim, a motion that was granted, with a subsequent modification of the class definition. 242 F.R.D. 421 (N.D. Ill. 2007); 242 F.R.D. 434 (N.D. Ill. 2007). This class is considered a subset of the ERISA class.

On May 16, 2006, plaintiffs again sought leave to amend their complaint, this time to add a claim for damages under ERISA § 502(a)(1)(B), a breach of contract claim for the R1500 agreement, two new named plaintiffs and a new defendant. The court permitted plaintiffs to amend their complaint to include one new named plaintiff, but denied them leave to add the other, as he did not fit the class definition. 2007 U.S. Dist. LEXIS 39638 (N.D. Ill. May 3, 2007). Plaintiffs' motion for leave to add a new defendant or another breach of contract claim was also denied. Plaintiffs offered no reason why they did not previously make this claim or add this defendant, and the breach of contract claim would have required another class certification analysis. *Id.* Leave was granted for plaintiffs to seek damages under ERISA. *Id.* Allstate moved to amend its affirmative defenses, and it was granted leave to do so. 2008 U.S. Dist. LEXIS 22040 (N.D. Ill. Mar. 19, 2008). Allstate then filed a motion for judgment on the pleadings, which was denied. 2008 U.S. Dist. LEXIS 23371 (N.D. Ill. Mar. 21, 2008). Allstate now moves for summary judgment on both class claims: ERISA § 510 and breach of contract.

According to Allstate's electronic records, the ERISA § 510 class is comprised of 1755 former employee-agents who retired, terminated, or converted to independent contractor status between April 1, 1998 and May 31, 1999. Of that 1755, 1460 employee-agents converted to independent contractor status, while 295 either quit or retired. According to the same records, the breach of contract subclass is comprised of 797 members who were employed under the R830 contract (or some variation of it) at the time they terminated their employment, retired or converted. Of that group, 622 converted and 175 either retired or quit.

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable

to the non-moving party, reveals that there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant must

put forth evidence demonstrating that no genuine issue of material fact exists. Once the

movant has met this burden, the non-moving party cannot simply rest on the allegations in the

pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of

material fact exists when "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d

202, 106 S. Ct. 2505 (1986). The court must consider the record as a whole in a light most

favorable to the non-moving party and draw all reasonable inferences in its favor. Anderson,

477 U.S. at 255; Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000).

Defendant has moved for summary judgment as to both class claims: ERISA § 510 and

breach of plaintiffs' employment contract. To prevail under ERISA § 510, plaintiffs must

show that Allstate "made a conscious decision to interfere with [plaintiffs'] attainment of

pension eligibility or greater benefits." Meredith v. Navistar Int'l Trans. Corp., 935 F.2d 124,

127 (7th Cir. 1991) (quoting Dytrt v. Mountain State Telephone and Telegraph Co., 921 F.2d

889, 896 (9th Cir. 1990). Plaintiffs may do so under either a direct or an indirect method of

proof. The direct method requires the proverbial "smoking gun," something plaintiffs do not

claim they have. Instead, they seek to prove Allstate's violation by the indirect method, known

as the McDonnell Douglas method of proof, after its namesake case, McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973). Under this method, plaintiffs must first establish a *prima facie*

case of harassment, demonstrating that (1) they were members of a protected class; (2) they

were performing at a level that met their employer's legitimate expectations; (3) they were subject to adverse employment actions; and (4) they were treated differently than similarly situated persons outside of the protected class. Rhodes v. Illinois DOT, 359 F.3d 498, 504 (7th Cir. 2004). If plaintiffs succeed in making such a case, a presumption arises in their favor and the burden shifts to Allstate to articulate a legitimate reason for institution of the AAS. Wilson v. AM General Corp., 167 F.3d 1114, 1119 (7th Cir. 1999)(citations omitted). Once Allstate articulates such a reason the presumption falls away, and to survive summary judgment plaintiffs must offer sufficient evidence to permit a reasonable jury to conclude that Allstate's asserted reasons are merely pretextual. Id.

To succeed on a claim for breach of employment contract, plaintiffs must demonstrate (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by the defendant, and (4) resultant injury to the plaintiff. Catania v. Local 4250/5050 of the Communs. Workers of Am., 359 Ill. App. 3d 718, 724 (Ill. App. Ct. 2005).[6]

The third element of both plaintiffs' ERISA prima facie case and plaintiffs' breach of contract claim is premised upon a theory of constructive discharge, and since we find that issue dispositive, we address it first.

Constructive Discharge

Constructive discharge is normally a question for the trier of fact, but can be decided as a matter of law where a plaintiff has not created a genuine issue of material fact. See e.g. Henn v. Nat. Geographic Soc'y, 819 F.2d 824 (7th Cir. 1987); Saxton v. American Telephone & Telegraph Co., 785 F. Supp. 760 (N.D. Ill. 1992).

An employer constructively discharges an employee "only if it makes an employee's

---

[6]The court acknowledges that a choice-of-law determination has yet to be made on plaintiffs' breach of contract claim. However, for purposes of this summary judgment determination, we find that the basic elements of breach of contract transcend any nuances that may be present among the various states' laws.

working conditions so intolerable that the employee is forced into an involuntary resignation." Henn, 819 F.2d at 829 (citations omitted). Absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress." Grube v. Lau Industries, Inc., 257 F.3d 723, 728 (7th Cir. 2001). The intolerable nature of an employee's working conditions is judged by the standpoint of a reasonable employee. EEOC v. U. of Chicago Hospitals, 276 F.3d 326, 331 (7th Cir. 2002).

Plaintiffs no longer assert, as they did previously, that the AAS in its entirety made their working conditions intolerable. Nor do plaintiffs take issue with nine out of ten of the AAS standards. Plaintiffs' sole contention in response to Allstate's motion is that the service availability standard, requiring longer office hours and the presence of a licensed person in the office at all times, created objectively intolerable working conditions that drove plaintiffs to retire, quit or convert. Alternatively, plaintiffs' argue that Allstate knew, in enacting this requirement, that a majority of agents would be unable to comply. However, the evidence and plaintiffs' own admissions do not support these arguments.

First, a change in an employee's work hours generally does not rise to the level of intolerable working conditions. Grube, 257 F.3d at 728 ("Were we to hold that a mere change in working hours would rise to the level of creating a condition so objectively unbearable as to allow an employee to quit and then bring a claim of constructive discharge, employers would be in a most precarious position in adapting and maintaining employee's work schedules to fit within the parameters of their business needs." ). Plaintiffs' argument that these new hours were intolerable focuses on the specific situations of solo general agents (unable to hire licensed support staff), who did not, or for geographical reasons could not, team up with other agents. It also focuses on the specific hardships of certain NOAs who, because they were close to or had maxed out their office expense allowance, could not afford

to hire licensed support staff without taking a decrease in their compensation percentage. However, these particular situations do not represent the objective "reasonable employee," nor do they even represent several of the class members. For example, named plaintiff James Carson testified that because he was in a multi-agent office he was only required to be present at the office 2½ days in any given week, despite the increased hours' requirement (def. exh. 4, Carson 6/25/02 dep. at 21-22). Named plaintiff John Chaney, a solo NOA, testified that he consistently operated under his OEA budget: "I saved the company money in my office" (def. exh. 6, Chaney 3/28/03 dep. at 26). We hold that a reasonable jury could not find the service availability standard objectively intolerable when it was not subjectively intolerable to certain class members.

Alternatively, plaintiffs argue that Allstate instituted this standard knowing that its employee-agent force, as a whole, was not equipped to meet the new requirements and would be forced to quit, retire or convert, or otherwise be terminated for noncompliance. Plaintiffs rely on the SOOF documents to show that Allstate was aware that a number of its agents would be noncompliant with the service standards SOOF was considering. Even assuming that the SOOF standards did eventually become the AAS (a point hotly contested by the parties), the SOOF document only shows that approximately 12%, or 1600 agents, would initially be noncompliant. Even if we were to accept that number as true,[7] that number is far from the entire employee-agent force. Furthermore, that particular document also projects that 70-80% of those agents would come into compliance with the standard in the future. This document does nothing to demonstrate that Allstate knew that its agents, as a whole, would be noncompliant with the service standard, nor does it demonstrate that Allstate enacted the

---

[7] In an earlier opinion, the court held that the SOOF documents were admissible as non-hearsay, when offered to show Allstate's intent, but were inadmissible to prove the truth of the matter asserted therein.

AAS service availability standard with the intent to drive agents to quit, retire or convert. Finally, the fact that Allstate announced the service availability standard four months before its implementation, in order to give agents sufficient notice so they could plan accordingly, is evidence that forcing agents out was not its intent.

Plaintiffs argue that because they were unable to comply with this service standard, their termination was inevitable, driving them to quit, retire or convert. They cite EEOC v. U. of Chicago Hospitals, which holds that "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." 276 F.3d 326, 331 (7th Cir. 2002). Plaintiffs rest their argument on the fact that compliance with the AAS was mandatory and that failure to comply would result in discipline, including termination. This is not enough to survive summary judgment.

First, the holding in EEOC rested on the imminency of termination. 276 F.3d at 331. There, the plaintiff arrived at work only to find her belongings packed and her office used for storage. Id. at 332. Coupled with the fact that her supervisor, who was fired for refusing to fire her, warned her that she was going to be terminated, the court found that "the handwriting was on the wall and the axe was about to fall." Id. (citations omitted). This, held the court, could be considered unbearable to a reasonable employee. Id. Plaintiffs' situations do not even come close to mirroring that of EEOC. They cite to the fact that termination was a possibility at some future point. While Allstate did make the AAS mandatory, and did cite termination as a possible outcome of noncompliance, it also had in place a multi-step discipline system which offered a number of remedies prior to termination (def. exh. 38, AAS Trainer's Guide at AF6507, AF6513). Furthermore, in that disciplinary system, noncompliance with the AAS was not listed as an act that would be met with immediate termination. (Id. at AF6514).

Allstate's CEO, Ed Liddy, also testified that termination was a last step after many steps of remediation (def. exh. 29, Liddy dep. at 127). Plaintiffs' mere prospect of discipline in the future is not enough to demonstrate an intolerable work environment. Goldmeier v. Allstate Ins. Co., 337 F.3d 629, 634 (6th Cir. 2003). Nor is "the prospect of being fired at the conclusion of an extended process" sufficient. Cigan v. Chippewa Falls School Dist., 388 F.3d 331, 334 (7th Cir. 2004).

Plaintiffs do not cite one instance where a class member or, indeed, any employee-agent was disciplined for failure to comply with the service availability standard. According to plaintiff Flanagan, the office hours' requirement was not strictly enforced by his manager and he was permitted to leave his office to go to lunch, the bathroom or the bank (def. exh. 16, Flanagan 6/21/05 dep. at 79). Plaintiff Carson testified that the agents in his office did not comply with the extended hours, they closed their office at 5:00 every evening and did not open on Saturdays (def. exh. 4, Carson 6/25/05 dep. at 34). He testified that no one in his office was reprimanded for refusing to comply with this requirement. (Id. at 25). Additionally, Ed Liddy testified that he believed managers had some leeway to accommodate extenuating circumstances, such as financial hardships or remote geographical locations (def. exh. 29, Liddy dep. at 200). As noted above, at least five plaintiffs did not wait for institution of the AAS before leaving. But "an employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." Grube, 257 F.3d at 728.

The AAS applied to all agents, regardless of employment status. Therefore, an assumption can be made that those class members who converted – a majority of the class – believed they would be able to comply with the service availability standard, otherwise they

would not have remained agents.[8]  Looking at the numbers, the SOOF documents opine that approximate 1,600 employee-agents, or 12% of the workforce, would be out of compliance with the AAS at the beginning.  Those documents go on to project that between 70 and 80% of those agents would come into compliance in time.  That leaves between 320 and 480 agents who would not be in compliance.  We would then need to consider, of those agents, how many were subject to imminent termination for their noncompliance.  On this record that number appears to be zero, since plaintiffs have not pointed to any employee-agent subject to discipline for noncompliance with the service availability standard, and Allstate's officers' testimony makes clear that it was willing to work with agents with extenuating circumstances, and that termination was possible only as a last resort.  While it might be possible for a select few former employee-agents to make such a case on these terms, that is not this class.

Taking all of the facts in the light most favorable to plaintiffs, the reasonable inferences from this record would not allow a jury to infer that plaintiffs' termination for failure to comply with the AAS was inevitable.  Henn, 819 F. 2d at 930.  Since plaintiffs fail to make a case for constructive discharge, summary judgment is appropriate on both the ERISA § 510 claim and the breach of contract claim.

Pretext

However, even if plaintiffs could put forth sufficient evidence of constructive discharge, summary judgment would still be warranted on the ERISA § 510 claim.  Plaintiffs must demonstrate that Allstate instituted the AAS with the specific intent to interfere with plaintiffs' benefits.  To do so, they must demonstrate that Allstate's proffered business reasons for

---

[8]We understand plaintiffs' argument that EAs were more capable of complying with the standards because they had fewer restrictions on their office budgets and ability to hire licensed support staff. However, as noted above, those restrictions did not affect all class members' ability to comply with the AAS, and plaintiffs have not offered evidence that this restriction affected every class members who chose to convert.

instituting the AAS are pretextual. However, plaintiffs actually concede the legitimacy of Allstate's business reasons for nine of the ten AAS standards. Therefore, addressing Allstate's reasons for instituting the service availability standard, we find plaintiffs unable to survive summary judgment.

Allstate offers three reasons for the imposition of this standard: the IRS closing agreement, which required NOAs to work full-time and for set hours; the needs of customers, as determined by Allstate's research; and market forces, including the need to compete with 24-hour insurance companies. In order to show that these reasons are merely pretext, plaintiffs must point "to evidence which would tend to prove the proffered reason was factually baseless, not the actual motivation for the discharge, or insufficient to motivate the discharge." Dyrek v. Garvey, 334 F.3d 590, 598 (7th Cir. 2003).

Plaintiffs argue that Allstate's proffered reason that it had to comply with the IRS closing agreement is pretextual. They argue that nothing in that closing agreement required the extended hours that Allstate implemented, or that a licensed person be in the office at all times. Nor did it prevent Allstate from increasing agents' office expense allowance so that more agents could afford licensed support staff. While this may be true, the closing agreement did require agents to work full-time with set office hours. Furthermore, contrary to plaintiffs' contention, the closing agreement is not the only reason proffered by Allstate for the change. Plaintiffs do not address Allstate's other two reasons: customer demands and market forces. (*See* plf. resp. exh. B, Dixon dep. at 91-92). Generally, where multiple reasons are given, the employee must demonstrate that each reason is pretextual. Wilson v. AM General Corp., 167 F.3d 1114, 1120 (7th Cir. 1998). If the employee can produce evidence that would allow a reasonable jury to so conclude "the employee is entitled to a jury determination on that issue." *Id.* Here, plaintiffs have failed to produce such evidence.

## Specific Intent

Finally, plaintiffs cannot demonstrate that Allstate acted with the specific intent to deprive them of benefits. Plaintiffs offer SOOF documents to show that Allstate enacted the AAS knowing that it would have the effect of eliminating its employee-agents.[9] However, knowledge is not the same as intent, and it is not sufficient to create a genuine issue of material fact. *See* Finnegan v. Trans World Airlines, Inc., 767 F. Supp. 867, 876 (N.D. Ill. 1991). The SOOF documents themselves project that 70-80% of noncompliant agents would come into compliance. In addition, almost every Allstate decision-maker deposed in this case testified that Allstate did not impose the AAS with the intent to drive out its employee-agents (def. exh. 17, Bob Gary dep. at 21, 27; def. exh. 18, Hammack dep. at 119, 181; def. exh. 21, Hutton dep. at 55; def. exh. 29, Liddy dep. at 63, 117).[10] At best, the SOOF documents demonstrate that attrition due to noncompliance with the AAS might be a consequence, albeit an unfortunate one, of the imposition of the new work requirements. However, "no action lies where the alleged loss is a mere consequence, as opposed to a motivating factor behind the termination." Meredith v. Navistar Int'l Trans. Corp., 935 F.2d 124, 127 (7th Cir. 1991). As such, plaintiffs have not created a genuine issue of material fact that Allstate's proffered reasons are pretextual and summary judgment is appropriate.

---

[9]Plaintiffs argue that the SOOF initiative led to the creation and implementation of the AAS, an assertion that is disputed by Allstate. Plaintiffs have offered sufficient evidence to allow a jury to determine whether or not the SOOF led to the AAS. As stated in our order on the admissibility of the SOOF documents, conflicting testimony exists as to whether Phil Lawson, the official creator and implementer of the AAS, was apprised of the contents of the SOOF documents during the time the AAS was being created. There is also significant overlap between the standards created by SOOF and the AAS, which could allow a jury to infer some relationship between the two. However, whether or not the SOOF did lead to the AAS is not important, because that relationship alone is not evidence of pretext.

[10]The only exception being Ed Dixon, who was not involved in SOOF. However, Dixon did testify that at no time did Allstate pressure employee-agents to convert (plf. exh. B. Dixon dep. at 67-72).

## Class Certification

Even though the court grants summary judgment on both class claims, we take a moment to address the class certified in this case. When we found class certification appropriate, we did so with the understanding that plaintiffs were asserting that the AAS, as a whole, was implemented to harass employee-agents into retiring, converting or quitting, regardless of individual circumstances. Plaintiffs' response to summary judgment, however, makes an argument that is quite apart from the one made in support of class certification.

First, plaintiffs have offered absolutely no evidence that employee-agents who terminated their employment prior to the institution of the AAS possess a claim for relief. In addition, as noted above, plaintiffs no longer appear to take issue with the AAS as a whole, or nine of the ten AAS provisions. Furthermore, their arguments regarding the service availability standard revolve around certain specific agents' situations, such as solo general agents unable to team up with other agents, and solo NOAs who did not have sufficient office expense allowance to hire licenced support staff. But, as demonstrated, there are a number of class members, named plaintiffs even, who fall outside these categories, and for them the service availability standard could not be considered subjectively, let alone objectively, intolerable. Class members such as named plaintiff Flanagan, were not subject to the intolerable work requirement because their sales managers permitted exceptions to be made. The class and subclass that plaintiffs argue are entitled to a trial on the merits, are much smaller than those certified for disposition. Therefore, even if summary judgment were not appropriate in this case, we hold that the classes, as currently defined, would require decertification because they do not meet the requirements of Rule 23(b)(3) that common issues predominate and that the named plaintiffs adequately represent class interests.

## CONCLUSION

For the foregoing reasons, Allstate's motion for summary judgment is granted.

_James B. Moran_
**JAMES B. MORAN**
**Senior Judge, U. S. District Court**

_May 23_____, 2008.